Argued October 1; affirmed November 26, 1940

# TRUCK INSURANCE EXCHANGE *v.* TRUCK INSURANCE EXCHANGE, OF 649 SOUTH OLIVE STREET, LOS ANGELES, CALIFORNIA, ET AL.

(107 P. (2d) 511)

*Paul R. Hendricks*, of Salem, for appellant.

*Robert F. Maguire* and *Donald K. Grant*, both of Portland (Maguire, Shields & Morrison, of Portland, on the brief), for respondents.

ROSSMAN, J. This is an appeal by the plaintiff from a decree of the circuit court in favor of the two defendants which was entered in a suit instituted for the purpose of securing a decree enjoining one of the two defendants (Truck Insurance Exchange) from the use of its name, and for the recovery of a judgment against both it and the other defendant in the sum of $100,000. The latter is the amount in which the plaintiff says it was damaged through the defendants' alleged (1) wrongful appropriation to the defendants' use of the plaintiff's name; (2) wrongful conversion of an insurance business which the plaintiff says it had established; and (3) wrongful appropriation to defendants' use of some records, plans and rate structures concerning which the plaintiff further alleges that (a) they were useful in the establishment and operation of a reciprocal insurance exchange; (b) the plaintiff owned them; and (c) they were original, unique and valuable. The defendants deny all averments which charge them with wrongful conduct. They also deny that the plaintiff had established a business and that it possessed any unique plans, ideas and rate structures suitable to a reciprocal insurance exchange. They aver that the defendant insurance exchange had been organized and was engaged in business before the incorporation of the plaintiff.

The plaintiff is an Oregon corporation possessing a capital stock of $5,000. It filed its articles of incorporation August 22, 1935. From them we quote:

"The objects of this corporation and the business in which it proposes to engage are as follows: To maintain an agency for the issuing, writing and selling policies of insurance issued by the regularly incorporated insurance companies and/or reciprocal insurance exchanges * * * to conduct a general in-

surance agency and insurance brokerage business
* * * .''

The other provisions of its articles of incorporation authorize it to buy, own and sell notes, stocks, bonds and other evidences of indebtedness as well as to buy, rent, own and sell real property. The plaintiff never possessed a license to act as agent for any insurance company and never was appointed by any insurance company as agent. It never sought to become nor was it ever an insurer. By reverting to the review of its articles of incorporation, it will be observed that they do not confer upon it power to engage in such a venture.

The defendant Truck Insurance Exchange is not a corporation. It is a reciprocal insurance association composed of commercial truck owners which was organized February 2, 1935, in Los Angeles, California. Its members are not identified with the plaintiff. They exchange between themselves contracts of reciprocal insurance. Sections 46-1316 to 46-1332, Oregon Code 1935 Supp., which contain the provisions of our laws regulating reciprocal insurance associations, refer to them as exchanges. We shall employ that word as a convenient means of identifying the defendant just mentioned. February 5, 1935, the Commissioner of Insurance of the State of California issued to the defendant exchange a certificate of authority authorizing it ''to transact the business of accident and health, liability and automobile insurance, on the interinsurance plan, within this State.'' February 18, 1935, the exchange forwarded to the Insurance Commissioner of the State of Oregon an application for a similar certificate. December 2, 1935, the requested certificate was issued and thereupon the exchange proceeded to exercise in this state the rights thus conferred. It is

similarly licensed in virtually all of the other states west of the Mississippi River.

The defendant Truck Underwriters Association is a California corporation which filed its articles of incorporation with the Secretary of State of California January 14, 1935. Those articles secured for it the right to serve as attorney-in-fact for reciprocal insurance exchanges. Ever since the defendant insurance exchange was authorized to transact business the corporation just mentioned, that is, the Truck Underwriters Association, has served as its attorney-in-fact.

In order to facilitate an understanding of the situation, we add that the attorney-in-fact for a reciprocal insurance exchange handles virtually all of its business affairs. It obtains for the exchange the applications for insurance, or, to speak more accurately, it obtains for it the applications for membership. It also selects the risks, rejecting those which do not meet its requirements. The defendant Truck Underwriters Association receives as compensation for the services which it performs for the defendant exchange 20 per cent of the sums paid as premiums.

Before further relating the facts, it may be well to note once more that the plaintiff is neither a reciprocal insurance exchange nor an insurance company. Since it never possessed a license to handle insurance as a broker, nor was ever appointed agent by an insurer, it likewise has never served either as broker or agent. A reciprocal insurance exchange, according to the evidence, is never a corporation; it is always a nonincorporated association. Its members indemnify one another against loss and, in turn, receive from one another indemnity against loss. The inter-insurance among the hundreds or thousands of members is effected through the medium of an attorney-in-fact.

The complaint alleges that ever since the plaintiff was incorporated it has been engaged in the business of

"writing and selling policies of insurance of every kind and nature whatsoever issued by regularly incorporated insurance companies and reciprocal insurance exchanges both domestic and foreign * * *. Plaintiff subsequent to its incorporation and its appropriation and use of its said trade name expended large sums of money in the establishing and advertising of said name and plaintiff's said business with particular regard to insurance of the kind and nature required by the owners of auto trucks, and developed, built up and acquired a valuable insurance business and good will with such clientele, and further expended large sums of money in making a thorough survey and study of the truck insurance exchange business and reciprocal exchange insurance and acquired and developed such plans, records and rate structures as were necessary and valuable in carrying on and maintaining such business and that the records, plans and rate structures of plaintiff were acquired by defendants, defendants then and there well knowing that the same were the property of plaintiff, by devious and roundabout manner * · * * defendants, having so acquired plaintiff's records, plans and rate structures, and fully understanding the value of plaintiff's business and deliberately planning and intending to steal and appropriate the same formed defendant Truck Insurance Exchange, as a part of and as an association to operate in connection with defendant, Truck Underwriters Association, and cause defendant, Truck Underwriters Association, to be appointed attorney-in-fact for said defendant, Truck Insurance Exchange."

The complaint then alleges that, pursuant to their plan "to steal and appropriate the established business of plaintiff," the defendant exchange started to transact business in Oregon in 1935, "using the name Truck Insurance Exchange and the plans, schedule and rate

structure of plaintiff.'' Continuing, the complaint avers that the defendants at that time knew that

"plaintiff Truck Insurance Exchange had been established long before the entrance of defendant into the State of Oregon, and that plaintiff had been engaged in its said business continuously and had built up and maintained an organization serving some 2000 truck owners, and that the acts of defendants in appropriating the business and property of plaintiff as above set forth constitutes commercial piracy and deceived the public and do now deceive the public, and such acts have deprived and do now deprive plaintiff of a large part of plaintiff's truck insurance business as well as confusing and do now confuse the public.''

As we have already stated, all of the complaint's averments are denied with the exception of those that set forth that the defendants are engaged in business in this state.

Appellant's (plaintiff's) sole assignment of error is the following:

"The Court erred in dismissing the above-entitled suit and in finding in favor of respondents and against appellants.''

It amplifies that contention with the following points:

1. "Aside from the law of trade-marks, courts will protect trade-marks or reputations on the broad ground of enforcing justice and protecting one in the fruits of his toil.

2. "Losses sustained and gains prevented are proper elements of damages.

3. "A witness is presumed to speak the truth * * *.''

The words just quoted, and those omitted, compose § 9-203, Oregon Code 1930.

The argument contained in appellant's brief deals only with the evidence. It insists that the plaintiff

possessed an insurance business and some valuable plans, ideas and rate structures for a reciprocal insurance exchange which originated in the mind of G. M. Fox. The brief declares that the defendants converted those items to their own use. Fox became the leading spirit in the incorporation of the plaintiff, and after its incorporation its president. After the brief stated that Fox originated the plans and rate schedules, it declares:

"Appellant's idea, plan and business was the only one of its kind in these United States. As unique as a red, white and blue horse. It is now found in possession of defendants."

Since the plaintiff confines its argument to the evidence, we shall now undertake a review of the latter. We said that G. M. Fox was the leading spirit in the formation of the plaintiff and that he was elected its president. His two associates were W. B. Yates, an attorney, and A. D. Cutler, proprietor of a printing establishment. The former was elected secretary of the corporation, and the latter its vice-president. Fox purchased 250 of the corporation's 500 corporate shares, Cutler 240 shares and Yates 10. None of the three paid any cash for their stock. According to the corporate records, Fox offered for 249 of the corporation's shares "all of my right, title and interest in and to a general insurance agency heretofore conducted by me at * * * together with all the equipment pertaining thereto and the goodwill surrounding said business together with such applications as I may have in my possession which have been made in connection with efforts previously expended by me in the formation of a reciprocal insurance exchange." The offer was accepted. Cutler, who was a printer, stated in his offer to the plaintiff: "I have incurred considerable expense, time and labor in

the preliminary steps having furnished advertising matter, advertising space in various publications and advertising literature, together with time and other labor in connection therewith, all of which is of the reasonable value of $2,400." The offer then expressed his willingness to accept 239 shares in satisfaction of the account. The offer was accepted. The minutes of the corporation indicate that Yates "presented his bill for legal services performed in the amount of $100 and orally agreed to accept in full payment thereof nine additional shares." The proposition was accepted. In this way the three men came into possession of 497 shares of their stock. Each had subscribed for one share of stock immediately before the corporation's officers were chosen. Fox believed that he paid for his single share by defraying the expenses of filing some papers. Yates and Cutler gave no explanation of the manner in which they obtained their single shares.

As was indicated by Fox's offer, from which we quoted in the preceding paragraph, he possessed an insurance agency. At that time there existed in Portland an organization entitled Association of Commercial Truck Owners. Apparently it was a voluntary corporation possessing no capital stock. Its purpose seemingly was to serve the needs of truck owners wherever concerted action was required. Fox was not one of its officers, but was attached to its office staff. Truck owners needed fire and casualty insurance and in order to serve those needs of its members the association maintained an insurance department. Insurance companies were reluctant to accept this business. Fox, as well as some of the other witnesses, so testified. It was especially hard to induce insurers to issue policies upon

long-haul trucks.  One of plaintiff's witnesses swore: "Anything over 50 miles was hard to place." In 1933 the legislature of this state made it compulsory for all commercial truck owners to provide public liability and property damage insurance.  According to Fox, this legislation confronted every commercial truck owner with the difficult problem which had perplexed those who had voluntarily sought insurance.  Continuing, he said that the reluctance of insurance companies to accept the business of his members continued after the enactment of the compulsory insurance act, and none of the companies would accept it unless the insurance agent who brought an application produced a sufficient volume of other business.  Fox had no other business to offer.  The premiums which were charged to commercial truck owners Fox described as very high and claimed that they multiplied themselves every week or two.  Moreover, according to him, cancellations were frequent.  He described the rate structures for trucks engaged in long hauls as based upon distances that were purely arbitrary (50 or 100 miles) and as not graduated according to the distances between the principal cities of the Northwest covered by the trucks.  As a result, he said, an operator, who went, for instance, 52 miles between to cities, was compelled to pay upon a 100-mile basis.

In July of 1934, according to Fox, the Association of Commercial Truck Owners, to which we shall hereafter refer as Fox's association, made him owner of its insurance department.  Proof in support of this statement is scant unless his statement itself suffices.  We shall assume that it does.  Having become owner of the insurance department, Fox was permitted thereafter to retain whatever commissions were paid by insurance

companies for policies issued to the association members whenever he obtained a policy for them. But Fox was encountering the difficulties which we have already described in finding insurance companies which would accept truck risks, and thus his part of the commissions was modest in size.

Fox's association possessed no license at any time from the Insurance Commissioner of this state authorizing it to act as an insurance agent. For the requirement concerning licenses, see § 46-112, Oregon Code 1930. In 1934 Fox personally possessed two such licenses, one of which authorized him, as agent of the United Pacific Casualty Insurance Company, to write casualty, surety and disability insurance, and the other authorized him, on behalf of the same company, to write automobile insurance. In 1935 he possessed three licenses, one of which authorized him, as agent of the company just mentioned, to write automobile insurance; the second authorized him, on behalf of the same principal, to write disability, casualty and surety insurance; and the third authorized him, on behalf of the Utah Home Fire Insurance Company, to write inland marine insurance. In 1936 he possessed two licenses, one of which empowered him, on behalf of the Utah Home Fire Insurance Company, to write inland marine insurance, and the other conferred upon him, as representative of the Associated Indemnity Corporation, similar power in regard to casualty insurance.

We have endeavored to gain from the record an impression of Fox's net income after he became owner of the insurance department of his association, but with unsatisfactory results. Whether through inadvertence or not he gave conflicting figures and omitted necessary

details. We observe, however, that he was asked, and answered, as follows:

"Q. Did you file an income tax report with the state in 1934?

"A. No, I don't believe I did. No, because I was working for nothing."

Fox swore that after the incorporation of the plaintiff (August 22, 1935) he transferred to it all of his insurance business. Seemingly, thereafter his income, if any, was paid to him by the plaintiff. He does not claim that he made any income tax returns for himself either before or after the incorporation of the plaintiff. Since he claims that he transferred his business to the plaintiff after its formation, let us now review the testimony which indicates whether the plaintiff ever had any business. We have already stated that it neither possessed nor ever sought to obtain a license from the Insurance Commissioner of this state to act as agent for any insurance company. Such licenses are exacted by the section of our laws previously cited. Nor is it contended that any insurance company ever designated the plaintiff as its agent. And it is conceded that the plaintiff was not in any form an insurer. As a witness, Fox was asked, and answered, as follows:

"Q. Was the Truck Insurance Exchange of Oregon ever licensed as a broker or agent? A. It never was.

"Q. The reason why the Truck Insurance Exchange took no license as agent or broker was because it could get no insurance company to appoint it as agent? A. That is the point.

\* \* \*

"Q. As I understand this Truck Insurance Exchange, an Oregon corporation, never applied for a license to act as broker or agent? A. No.

Concerning the plaintiff's income, he was questioned, and answered as follows:

"Q. Has it actually taken in any money? A. As a company?

"Q. Yes. A. No, no."

Yates, secretary of the company, was asked, and answered, as follows:

"Q. And it actually had not yet any business income up to this time? A. No.

"Q. And your treasurer's report was very brief? A. Very brief and to the point—mostly to the point.

"Q. And the balance was nothing in and nothing out? A. That is right.

"Q. Now that has been true each year? A. Correct."

Cutler, vice-president of the plaintiff, was asked, and answered, as follows:

"Q. And you agree with them there has never been any income from the business of the Truck Insurance Exchange? A. That is correct."

The corporation's federal income tax returns for the years 1935, 1936 and 1937 are before us. The returns made to the state, if any, were not mentioned at the trial. The report for 1935 set forth that the plaintiff had sustained a loss of $1,118.14. Its returns for 1936 and 1937 have the merit of ease of understanding and entire lack of complication. They are as follows: "No net income. No business transacted during year. No change in capital structure." The corporation never had a bank account in its name and never possessed a set of account books bearing its title. Concerning that situation, Yates was asked, and answered, as follows:

"Q. Now your corporation has never had to set up a set of books yet? A. No. Mr. Fox was elected treasurer, but his duties have not been very onerous."

Fox, as a witness, disputed the verity of the 1936 and 1937 income tax returns of the plaintiff. Both he and Cutler signed the return for 1936. Although a separate return was made for 1937, which neither signed, the 1936 return, which the two signed, expressly stated that it covered 1937 also. Fox swore that the 1936 and 1937 returns were made about three months before the day when the trial commenced, which was January 25, 1939, and that the entries which we have just quoted were made at the suggestion and upon the recommendation of a representative of the internal revenue department of the federal government. He was unable to recall the official's name. In explanation of the entry, he swore that the official told him, ''That was the simplest way to make this return.'' He claimed that he had told the official that the plaintiff transacted business in the two years covered by the returns, but when asked to repeat the amount that he told the official he was unable to remember it. Finally, he said, ''I didn't state him any amount,'' and replied, ''I imagine I did'' when asked whether he told the official that the plaintiff's 1936 business brought it any income. Cutler, as a witness, did not claim that any representative of the internal revenue bureau or any other person suggested that the words which we quoted from the 1936 and 1937 returns be employed. He remained silent upon the subject. He did, however, testify concerning the plaintiff, ''I would say it had quite a little income,'' but did not otherwise indicate the amount. He admitted that when his deposition was taken preceding the trial he gave the testimony which we quoted from it in a preceding paragraph and in which he said that the plaintiff had never had any income. At the time of taking the deposition he was also asked, ''It has been outgo instead?'' and replied,

"All outgo." Upon redirect examination (during the trial) plaintiff's counsel asked him what he meant by "outgo" and he replied, "Well, the company wasn't making any money to pay any dividends, both Mr. Fox and myself were putting up money to keep it going and trying to get enough applications together to form a reciprocal insurance association."

Fox does not claim that he ever sought, on behalf of the plaintiff, to make an amended return for the years 1936 and 1937 so as to make the returns which he signed recite the facts as he sought to describe them on the witness stand. It will be observed that, as a witness, he gave a most vague account concerning the plaintiff's purported income.

We are thoroughly convinced that no court ought to display any patience with an attempt like Fox's to create income as the basis for a $100,000 damage claim, when none existed, at income tax time. The magician's wand has no place in the courtroom. As we proceed we shall assume that the returns told the truth.

■ Fox, in explanation of the absence of a bank account and set of account books bearing the plaintiff's name, swore that it used his bank account and his books. It would be remarkable if this were true in view of the fact that two others owned one-half of the corporate shares of the plaintiff. In further explanation, he added that, since Cutler owned a printing business, he and Cutler had agreed that whatever profits were made by the plaintiff should belong to him (Fox) "until we got to the point where we could develop our reciprocal." He added, "I had to live, I had to make my living some way." That explanation, however, failed to mention Yates, who owned 10 shares of the plaintiff's corporate stock. Moreover, if that explanation reflected the truth,

the incorporation of the plaintiff was a useless act. We shall shortly show that it was never intended that the plaintiff should become a reciprocal inter-insurance exchange, nor the attorney-in-fact for one. The income tax returns present an alternative explanation of the plaintiff's non-possession of a bank account and books of account. They indicate that the plaintiff never had any need for either since it never had any business. In other words, the plaintiff was stillborn, and the business which we have been discussing, such as it was, remained Fox's. In explanation of the fact that the plaintiff never possessed a license issued by the insurance commissioner, Fox endeavored to testify that licenses intended for an agent, corporate or individual, are sometimes issued in the name of an employee of the agent for the latter's use. If such a practice exists, it appears to be in violation of § 46-114, Oregon Code 1935 Supp. Objections made to the questions which sought to prove this practice were sustained in the circuit court. After one of these rulings had been made, plaintiff's counsel said, ''I will withdraw the question.'' Upon meeting with similar rulings at other times the plaintiff merely abandoned the matter and proceeded with other inquiries. At no time did plaintiff's counsel make an offer of proof. Finally, near the close of the trial, the plaintiff sought leave to amend its complaint so as to afford a better basis for the testimony which it had offered. The motion to amend was denied. Neither that ruling nor the ones that sustained objections to the questions just mentioned are made the subject-matter of an assignment of error, nor of any argument in appellant's brief. We quoted in full the only assignment of error in the brief and likewise the points which supplement it. The propriety of the rul-

ings which we have just stated are, therefore, not before us. Moreover, as is indicated by the income tax returns, the plaintiff, even if it possessed a license vicariously, did no business—at least not in 1936 and 1937. Fox makes no claim that it did any business after those years.

We have said that it was never intended that the plaintiff should become a reciprocal inter-insurance exchange, and likewise never intended that it should be the attorney-in-fact for one. We now quote from the testimony of Yates, director and secretary for the plaintiff:

"The plaintiff Truck Insurance Exchange is not a reciprocal. We intended to use an attorney-in-fact for reciprocals, either that or else organize a corporation for the attorney-in-fact, and amend these articles for a reciprocal. * * * We could use that name for the reciprocal, is what I meant to say. Whether we could amend would be a question of legal procedure, possibly turn the Truck Exchange over to another corporation which would be the attorney-in-fact and dissolve the present corporation."

Fox also indicated that it was not contemplated that the plaintiff should be either a reciprocal or the attorney-in-fact for one. For instance, in response to the following question submitted to him by the presiding judge, "You had in mind some form to provide reciprocal insurance?" he replied, "That was the point, and to use this name 'Truck Insurance Exchange' for that reciprocal and then turn around and make our attorney-in-fact this corporation. This would, I figured, cost a lot of money." In response to further questioning by the presiding judge, he added, "We maintained this for the conduct of our business and the formation of our reciprocal, I don't exactly know how the attorneys were

going to work it out." He was further questioned and answered as follows:

"Q. But the Truck Insurance Exchange wasn't to be the attorney-in-fact? A. No, sir.

"Q. You would have to organize another corporation? A. True.

"Q. So the Truck Insurance Exchange could never make any profit out of the attorney-in-fact for the reciprocal business? A. No."

The explanation of the situations disclosed by the above testimony seems to be that Fox's purpose in effecting the incorporation of the plaintiff was not to launch it into business, but to obtain some sort of right upon the name Truck Insurance Exchange. His hope was some day to organize a reciprocal exchange and then give to it the plaintiff's name.

While serving the needs of the truckers who came to him in the above capacities Fox claims that he became thoroughly familiar with truck insurance; in fact, he felt that he had become a truck insurance expert. Eventually he became satisfied, so he swore, that the only solution of the truck insurance problems of the members of his association was to bring about the formation of a reciprocal truck insurance exchange. Having arrived at that conclusion, he devised, so he claims, the plans, ideas and rate structures which he mentions to his complaint and which he says were suitable for the formation and operation of an exchange. It is those plans, rate schedules, etc., which his brief describes "as unique as a red, white and blue horse."

We shall now consider the features of his plan, first mentioning the rate structure. The rate schedules, according to Fox, graduated the premiums to be paid by trucks engaged in long-haul business according to the

distances generally run by the members of his association, and thus avoided rate classifications based upon arbitrary distances, as, for instance, 50, 150 or 300 miles. However, his objection to existing rates was not based upon any other feature of them. This is evident from a statement which we shall shortly quote and which he made in a letter dated May 22, 1934, addressed to R. J. Chrisman, manager in Oregon for the Farmers Automobile Inter-Insurance Exchange of Los Angeles. The exchange just mentioned began business April 8, 1928, and has since been licensed to do business in 16 states west of the Mississippi. The evidence indicates that its operations are successful. The statement to which we have just referred is: "While there is no necessity for a reduction of present non-conference rates, there is a real necessity for a definite interpretation of the rules, as applying to classifications of lists * * *." When that letter was written Fox hoped that Chrisman would help him in the organization of a local truck reciprocal insurance exchange. It seems that some of the larger stock insurance companies which accepted truck business had formed a conference. Those outside of the conference employed non-conference rates, that being the term which is found in the above quotation. Fox's rate schedules evidently were purely tentative. This is indicated by the excerpt which we now quote from a document, dated September 1, 1934, and which was prepared by Fox while he was negotiating with two other individuals for the formation of a reciprocal exchange. In that document he said: "Any rate structure that is set up at this time, must, of necessity, be subject to change and revision, as a great deal depends on what the conference and non-conference companies do in the near future as regards their greatly

increased rates. It does not seem possible that the new rates will last, * * *.'' He then expressed his belief that recent increases in rates were higher than necessary, after which he said, ''The new rates must be flexible, simple and yet explicit, to provide for correct interpretation to apply to specific classes of operation and equipment * * * for these reasons, the rates as set out below should not be accepted without some further study and consideration. There are also some further points to be considered in classifications which the writer has not cleared up satisfactorily enough in his own mind to commit to paper at this time.''

We have just reviewed the portion of the testimony given by Fox which recited the features of his purported rate schedules. Nowhere did he say whether his proposed rates would achieve solvency for any insurer which adopted them. Surely solvency—not to mention a profit—is an important item in any insurance venture; and solvency, it seems to us, would justify a word or two of testimony when it is claimed that a given plan is worthy of $100,000 damages.

We have just reviewed the rate feature of Fox's plans. The second feature of his plans was termed by him ''safety engineering.'' It embraced regular inspection of insured trucks' equipment and the employment of available safety devices. About the only device which he mentioned specifically was a sleeper cab. But it appears from his testimony and that of other witnesses that sleeper cabs already constituted a part of many trucks when Fox became interested in the subject. He also suggested that the proposed exchange place relief drivers at convenient points along the routes followed by trucks whose owners belonged to the exchange so that they would be available to any trucks going beyond

that point. His labored explanation possibly betrays a lack of confidence upon his part in the practicability of the plan. According to the record, safety engineering in truck operation long antedated Fox's efforts. A third feature of his proposed plan was periodical examination of drivers and the dismissal of all who had bad driving records or inclination towards drunkenness. The fourth feature was to limit insurance to preferred risks. Fox did not claim that either the third or the fourth ideas had originated with him. The fifth feature was the incorporation of his association into the exchange. How this was to be done he left unexplained. The association at that time had about 2,500 members, many of whom owned more than one truck. The sixth feature of his plan was to name the new reciprocal exchange, Truck Insurance Exchange. Fox insisted that this name was very appropriate for the intended purpose.

After Fox had worked out the above plans and rate structures, he became desirous, as already indicated, of forming a reciprocal insurance exchange, or of somehow becoming associated with one. In April, 1934, he broached the subject to the above-mentioned R. J. Chrisman. According to his testimony and that of Chrisman, the two talked together several times upon the subject. The Farmers Automobile Inter-Insurance Exchange, of which Chrisman was manager for the state of Oregon, confined its activities largely to farmers' automobiles. Chrisman, who had no authority except to solicit applications for insurance and operate the Oregon agency, sent the letter which Fox wrote to him, and from which we have already quoted, to the home office of the Farmers Exchange in Los Angeles. The letter explained at some length the insurance problems of

the members of Fox's association and in a general way Fox's above-described plans. Apparently Fox expected Chrisman to use the letter as a means of soliciting the interest of others in the formation of a truck exchange. Thomas E. Leavey, at that time was the executive vice-president of the Farmers Underwriters Association which was the attorney-in-fact for the Farmers Exchange. Leavey made a copy of Fox's letter and sent it to Frank Harvey of Kansas City, who was the agent in that city for Markel Service and a director of Employers Reinsurance Corporation. Markel Service engaged solely in bus and truck insurance. We shall now explain how Leavey happened to know Harvey and why he sent the letter to him. About a year prior to Leavey's receipt of the letter he and John C. Tyler, who later became president of the defendant Truck Underwriters Association, had become interested in truck insurance. When their interest was first created they were hopeful that a reciprocal truck insurance exchange could be found which would sustain a co-operative relationship with the Farmers Exchange. Farmers who owned trucks as well as pleasure cars were continuously refraining from insuring their vehicles with the Farmers Exchange because it did not care to cover their trucks unless they were devoted to no commercial purposes whatever. Therefore, Leavey and Tyler were hopeful that a reciprocal truck insurance exchange could be found which would accept that business and in so doing co-operate with their exchange. In October, 1933, the two, in order to obtain more information concerning insurance organizations which were writing truck insurance, departed for the East where for five weeks they investigated the operations of insurance organizations which underwrote truck risks. In the course of the visit

they met the aforementioned Harvey. The latter was dissatisfied with the capacity in which he was employed and expressed a purpose to create an organization which would write truck insurance. That is the reason why Leavey sent Fox's letter to Harvey.

Fox at first testified that on May 15, 1934, Leavey came to Portland and, accompanied by Chrisman, called upon him. Next, he said that possibly it was not Leavey who called upon him, but a Mr. Jewett. We observe from the record that George C. Jewett, in January, 1937, became vice-president of the defendant Truck Underwriters Association. In 1935 he held an office with the Farmers Exchange. Upon cross-examination, defendants' counsel, after having both Leavey and Jewett rise, asked Fox to identify the one who called upon him. He rejected Leavey and thought that Jewett was the individual. In the meantime, he denied that he had ever heard of Harvey, but later, after having his memory refreshed by some correspondence, expressed the belief that Harvey called upon him June 11, 1934. Reverting to the purported conference of May 15, 1934, he claimed that besides Chrisman and himself two others were present. As already indicated, he thought that Jewett, and not Leavey, was one of these two and said that although he had been introduced to the third individual he was unable to recall that man's name. The best that he could do was to give a description of the third man, which was so meager that it fits virtually any dark-complexioned individual. He could not recall a single word which that person said, and, so far as is indicated by his testimony, this third person may have been a stranger to both defendants. Finally, he claimed that he was unable to recall definitely the time of the meeting better than to say it occurred in April, May or

June. He testified that in the course of the conference it was agreed that he should have a one-fourth interest in the attorney-in-fact corporation which would represent the contemplated reciprocal exchange. He added that it was further agreed that Leavey, Jewett and Tyler were to be the other three shareholders in the attorney-in-fact corporation, and that, finally, when it was suggested that Chrisman should have a share, he (Fox) acquiesced. Next, it developed that what was said concerning the one-fourth interest for himself was an offer which he made during the course of the conference. He thought that ''this gentleman from California'' acquiesced in his offer. The following is a sample of the vague testimony which he gave in describing the aforementioned meeting and the participants: ''There was a conference, I met somebody, Mr. Chrisman made this conference, arranged with somebody I understood was coming from California, but as I understand it, this Harvey, if he came with him,—he may have come as far as I know, in addition to the man who came from California. There was one man who sat there and said nothing, just listened, the other man did the talking, and Mr. Chrisman did not do much talking either.'' Whether ''the man who came from California'' had any connection with either of the two defendants was not disclosed by the plaintiff.

It is vague, faltering recollections of that kind which the plaintiff submits in proof of its charge that the defendants knew of the so-called unique plans and rate structures which the plaintiff says it possessed. Of course, those conferences occurred months before the plaintiff came into being.

After Harvey's conference with Fox, Chrisman sent to Leavey a short report of it. Referring to Harvey, he

wrote: "He is not very much impressed with the Association," meaning, of course, plaintiff's association. He then continued: "It seems as though Mr. Fox is more interested in obtaining a definite tie-in with some insurance company and is inclined to want to trade the volume of insurance he thinks he controls for that tie-up. Mr. Harvey is of the opinion that, regardless of whether he lines up with the Association or not, he can come into this territory and enjoy a fair volume of business. He feels that he can have this business whether it comes through the Association or direct." In his letter of May 22, 1934, Fox confirmed that impression by saying: "In this connection, we will state at this time that whatever insurance hook-up is made it will have to be directly connected with this Association."

Harvey, after his visit with Fox, returned to Kansas City, and later abandoned hope of organizing the reciprocal insurance exchange.

Although the plaintiff left the identity of the participants in the aforementioned conference uncertain and could do no better than approximate the date of the conference, evidence coming from defendants' witnesses yields identities and dates.

Chrisman said that he had had many conversations by telephone and otherwise with Fox in the early part of 1934. He swore that in the spring of that year Harvey of Kansas City came to Portland and that the two of them then called upon Fox. He described the purposes of that meeting as twofold: (a) Harvey wanted to ascertain the nature of the Association of Commercial Truck Owners and whether it could be depended upon to provide a volume of desirable truck insurance; and (b) Fox desired to find an insurance organization which would accept the business which was coming to him

from the members of his organization and if possible become identified with it. Harvey held no office in or had any identity with the Farmers Exchange. Chrisman was positive that neither Jewett nor Leavey was present upon that occasion. He also swore that no one said anything concerning an interest to be possessed by Fox in any attorney-in-fact corporation. In fact the formation of such an organization was not mentioned. Leavey, as a witness, swore that, although he and Jewett were in Portland in April of 1934, he had never seen Fox prior to the commencement of the trial in which we are now interested. J. P. Bates, a member of an insurance firm which represented among other organizations the Farmers Exchange, wrote a letter to Leavey July 17, 1934, a copy of which is before us, and which mentioned the visit of Jewett and Leavey to Portland. That letter would have been unnecessary had Fox conferred with those two men during their April visit to Portland. Due to illness in his family, Jewett, whose home is in Los Angeles, did not attend the trial. Bates swore that Sam Simpson, whom Fox mentioned, and who, after the organization of the defendant Truck Insurance Exchange, became its vice-president, came to Portland in April, 1935, and that he thereupon took Simpson to Fox's office. He declared that the purpose of the visit was to ascertain whether Fox "had any business that might be profitable to the proposed company." Simpson gave similar testimony. He said that upon that visit he informed Fox that he was the manager of the Truck Insurance Exchange, a California reciprocal, and that thereupon Fox declared that he "wanted to place some business with us." It will be recalled that at that time the defendant Truck Insurance Exchange had not yet received its license to do business in this state. Before

his visit to Portland, Simpson sent to Chrisman a letter advising him of the time of his contemplated arrival in Portland. The letter stated that Simpson hoped upon that occasion to meet some truckers, the insurance commissioner, and the official having charge of the insurance department of the Public Service Commission. During the course of his visit to the insurance commissioner that official suggested that the formation of the Truck Insurance Exchange could be facilitated by having agents of the Farmers Exchange secure a duplicate application for the Truck Insurance Exchange, thereby enabling a transfer to be made to the latter after a total of 2,500 applications had been received. In view of Fox's inability to recall times and the names of individuals, we shall accept as true the information given by the defendants' witnesses concerning these conferences.

The Farmers Exchange was represented in Kansas City at the time of Fox's talks with Chrisman by the aforementioned Sam Simpson. He represented not only the Farmers Exchange, but also the Casualty Reciprocal Exchange. To the latter he delivered the larger volume of his insurance applications. About the time that Harvey was thinking of organizing a reciprocal insurance exchange Simpson was entertaining similar plans. He was anxious to locate on the Pacific Coast. His principal at that time was the attorney-in-fact for the Casualty Reciprocal Exchange. In the latter part of 1934 his superiors proposed to locate a branch office in Los Angeles and appointed Simpson its manager. In October of that year Simpson came to Los Angeles for the purpose of opening the office. In December Simpson's principals abandoned their plan. About that time the officers of the Farmers Underwriting Association decided to organize a truck insurance exchange and to

make Simpson its chief executive officer. Simpson accepted their offer and on the second day of January, 1935, went to work. Leavey swore that Simpson was hired to become the executive head of their truck insurance exchange because he had had more experience with truck insurance rates and truck insurance problems than anyone in their existing organization. This, together with what we have already said upon the subject, will have to suffice as an explanation of the manner in which the two defendants were organized. Simpson swore that the rates for truck insurance which the officials of the defendants finally adopted upon his recommendation did not coincide with any of the rates and rate schedules which Fox had devised. We shall shortly show from Fox's testimony that Simpson's statement was true. Simpson also swore that his rate breakdowns and schedules were patterned upon the kind that were in general use along the Pacific Coast at that time, and that no secrecy was possible concerning rates; in other words, no one could have a monopoly, as Fox claimed, upon a given rate schedule. In more than one of the Pacific Coast states, including Oregon, according to the witnesses, rates had to be filed with the state insurance commissioner or other like public official. Simpson further swore that safety engineering had been sponsored by insurance organizations since 1924 and that none of the plaintiff's ideas, as the plaintiff had described them from the witness stand, were new in the spring of 1934. Simpson claimed that he was engaged in a trucking business in 1921 and that his trucks at that time carried sleeper cabs. He testified that in the spring of 1934 while he and some other insurance agents were discussing reciprocal exchanges the name Truck Insurance Exchange was suggested as a suitable name for an

organization of that kind. It will be recalled that in the early part of 1935 after the defendants had been organized Simpson came to Portland, and, accompanied by Chrisman, talked to Fox, and that the latter in the course of the conversation expressed a desire to place insurance applications with Simpson's new truck exchange (the defendant Truck Insurance Exchange) as soon as it received a certificate entitling it to do business in this state.

Let us revert to Fox's hopes to organize or become associated with the organization of a truck insurance exchange. When Harvey returned to Kansas City and nothing came of his visit to the Coast, Fox's hopes that were based upon Harvey ended. A month or so after Harvey's return home Chrisman received no more letters from Leavey indicating the possible formation of a truck insurance exchange by Harvey. Whenever he had received promising news he had relayed it to Fox. Now this news stopped. Hence, Fox had to look to other places for a new ray of hope. He felt satisfied that he alone could not organize an exchange. Two insurmountable difficulties stood in the way, both of which had their source in his inability to comply with the requirements of § 46-1318, Oregon Code 1935 Supp. That section of our laws requires exchanges to deposit with the state treasurer $50,000 before being permitted to operate, and to possess applications for reciprocal insurance from owners covering not less than 2,500 trucks before being permitted to write truck inter-insurance.

After Harvey and Chrisman had ceased to be hopes, Fox discovered that three men, Aller, Matthieu and Weider of Portland, on behalf of the Lumbermens Reciprocal Insurance Company, whose headquarters were

in Kansas City, were undertaking the formation of a truck insurance exchange in Oregon. The exchange which they proposed to form was to be known as the Pacific Transport Underwriters and its attorney-in-fact, as they planned, would bear the name of Columbia Underwriting Company. Fox, with the consent of these men, enlisted in this effort. He tried to persuade Aller and Matthieu to name the proposed exchange the Truck Insurance Exchange, but failed. He also submitted to them, on typewritten sheets, his plans and ideas concerning a reciprocal insurance exchange. We had those sheets before us in delineating in preceding paragraphs his plans, ideas and rate schedules for an exchange. Whether Aller, Weider and Matthieu thought well of these plans, Fox did not state. The Association of Commercial Truck Owners at that time published a small magazine of interest to truckers known as Acto News. Fox was its editor. He inserted in its news columns announcements concerning Pacific Transport Underwriters and lauded the efforts which were being employed to establish it as promising a solution of the truckers' insurance problems. He also inserted in the publication advertisements urging truckers to submit applications for membership in the exchange. Blank applications for membership were distributed to prospects, but after extended efforts had been made to secure 2,500 applications the applications fell far short of the required number. Thereupon the efforts were discontinued and Matthieu paid the expenses of the experiment, which approximated $2,000. Subsequently Fox assumed possession, apparently with the acquiescence of his associates, of the applications which had been received and those are a part of "such applications as I may have in my possession" to which his offer, made

to the plaintiff at the time he received his 249 paid-up shares of stock, referred.

After all of the hopes described above had vanished and had failed to yield a reciprocal truck insurance exchange, Fox finally organized the plaintiff. Its name indicates that it is a reciprocal exchange, but, as we have pointed out, such is not its kind. Plainly it is nothing more than a peg upon which Fox hung his favorite name while waiting for the formation, somehow, of an exchange upon which he could bestow the name Truck Insurance Exchange.

It is evident that haste played a part in the formation of the plaintiff. The reasons are important and have their inception in the name. It will be recalled that the defendant Truck Insurance Exchange was organized February 2, 1935. December 2, 1935, it was authorized to do business in this state. It will also be recalled that the plaintiff filed its articles of incorporation August 2, 1935. Simpson came to Portland in April of 1935 and, as Fox freely admitted, the two held a conference. Fox described Simpson as the manager of ''the truck insurance department.'' Actually he was vice-president of the defendant Truck Insurance Exchange. Immediately after Simpson's visit to Portland the agents for the Farmers Exchange began to take duplicate applications for truck insurance. One of these was addressed to the Farmers Exchange which had authority to, and which did write the insurance. The other application was addressed to the Truck Insurance Exchange which was not yet authorized to do business in this state. When it received its certificate the insurance was transferred to it by the Farmers. In this period of time Fox sent a duplicate application in the manner just indicated to the Farmers and was paid a commission. This and other circumstances indicate that he, as a

self-styled truck insurance expert, must have known of the existence of the defendant Truck Insurance Exchange before he caused the plaintiff to be incorporated. Immediately before the plaintiff's articles of incorporation were filed, a search, which lacked the element of thoroughness, was made to ascertain whether any other organization was using a similar name. August 21, 1935, a letter of inquiry was sent to the director of corporations of California. That was the logical place for inquiry. However, on August 22, 1935, manifestly before a reply could be received, the articles were filed. It is that circumstance which persuades us that haste was an important feature. Possibly the haste was prompted by a belief that, under the circumstances, ignorance might be bliss.

We have said that Fox virtually conceded that the defendants were not employing the rate schedules which he had worked out. We shall now quote his testimony. Upon direct examination he said: "It was impossible for us to secure insurance for they were selling reciprocal policies about 20 per cent under any company I could get, and we couldn't compete with them, and therefore my business went off—out the window, and it wound up by me sending them hundreds of customers myself. I couldn't get insurance for my men at the figures they quoted." He was referring to the time after the defendants had received their certificate to do business in this state. At that point he claimed that his insurance business collapsed.

We shall mention only two additional items disclosed by the record. One of these is negative in character. We shall now state it. The plaintiff presented no evidence indicating that the defendants at any time employed any plans, ideas or rate structures which Fox

originated. Notwithstanding the plaintiff's failure to present any substantial evidence upon this important phase of the case, the defendants' witnesses gave an account of the origin of the defendants' rate schedules which satisfies us that Fox was not their author. Certainly, there is no evidence in the record showing that sleeper cabs and relief drivers are any part of the defendants' insurance plans. The defendant Truck Insurance Exchange publishes a manual which includes a chapter entitled Safety Engineering and Inspection Service. The ideas discussed are of the kind familiar to those who advocate safety of automobile operation. The other fact, to which we adverted at the beginning of this paragraph, is the evidence which indicates that the words "insurance exchange", in the parlance of insurance men, has a definite significance and is a part of their common speech. Insurance men mean by those two words an organization which effects the reciprocal exchange of insurance among owners of a selected kind of property through the medium of an attorney-in-fact. In his articles in Acto News, Fox championed a truck insurance exchange as the solution for the truckers' insurance problems. In so using those words he employed them in their generic or descriptive sense and not as the name of any organization. Thus, he, too, recognized their established meaning. The majority of reciprocal insurance associations employ the word "exchange" in their names, according to substantial evidence before us.

We shall now state our conclusion. We are satisfied that the decree in the defendants' favor must be sustained. The following are our reasons:

(a) Since (1) the sections of our laws governing reciprocal insurance repeatedly refer to organizations

writing that kind of insurance as exchanges; (2) the words "insurance exchange" are commonly understood to designate an organization which exchanges interinsurance among its members through the medium of an attorney-in-fact; and (3) Fox himself more than once indicated that the words "Truck Insurance Exchange" constitute an ideal designation for an organization engaged in that kind of activity, the name which the plaintiff adopted for itself is a misnomer, capable of misleading the public. Upon the other hand, that name truly indicates the kind of business in which the defendant that adopted the name is engaged.

(b) No one can dip into the common vocabulary and, selecting some generic or descriptive words which commonly designate the business activities in which people engage, as, for instance, grocery store, appropriate the words to himself and thereby forbid their use by others who desire to launch similar enterprises. The words "Truck Insurance Exchange", which both the plaintiff and one of the defendants employ as their names, is a term of that kind and, therefore, incapable of exclusive appropriation. To avoid being misunderstood, we add that a name of a generic type may acquire a secondary meaning requiring later users to adopt means to avoid public deception. The plaintiff's interests require no protection of that kind.

(c) The evidence indicates that the promoters of the plaintiff knew of the existence and of the business activities of the defendant Truck Insurance Exchange before the plaintiff filed its articles of incorporation. Therefore, prior appropriation, if it were otherwise available, is absent here.

(d) The evidence fails to indicate that the plaintiff had any business when this suit was filed Feb-

ruary 18, 1938. It likewise fails to indicate that it had any business when the defendants were authorized to do business in this state. It is always the business, and not the name, which is protected in suits of this character. Rather, in its ultimate analysis, it is the public which is protected. The medium through which the protection is given is by affording protection to a business which has won the public confidence so that another business which has recently entered the field will not deceive the trade into a belief that it is the business unit to which the public has become accustomed. Since the plaintiff had no business the public needed no protection.

■ (e) The evidence fails to indicate that the defendants appropriated to their use any plans, ideas or rate structures that the plaintiff ever possessed.

■ (f) Even if we assume that the plaintiff conducted an insurance agency, that type of business and the one in which the defendants are engaged are so different that, unless the defendants change their business or their methods, the possibility of the public being misled is too remote to entitle the plaintiff to an injunction; at least the record fails to indicate that any member of the public has been misled.

It follows from the above that the decree of the circuit court must be affirmed. We have bestowed unusual attention upon the facts of this case on account of the repeated insistence by the plaintiff that it was wrongfully dealt with by the defendants, and that the circuit court failed to understand the evidence. In advancing this argument, the plaintiff insisted that the defendants gave false testimony. It is our belief that the evidence given by the plaintiff's own witnesses, together with the voids left in their case through the

failure to present evidence on material items, in itself indicates that the plaintiff lacks the right to any relief. In our above review we have been compelled to omit mention of several witnesses and of several items of evidence. The transcript of evidence consists of 655 pages. In addition there are several hundred typewritten or printed sheets which are marked exhibits. But we believe that we have given a fair representation of the evidence produced by the plaintiff.

RAND, C. J., and KELLY, BAILEY and LUSK, JJ., concur.